## *In re* Hunt, etc., Bankrupt.

*(District Court, D. New Jersey. March 1, 1886.)*

1. CONTRACTS—WAGERING CONTRACTS—RULE IN NEW JERSEY.

All contracts for speculation in stocks upon margins, where the broker and the customer do not contemplate or intend that the stock purchased or sold shall become or be treated as the stock of the customer, but the real transaction is the mere dealing in differences between prices,—that is, in the payment of future profits or losses, as the event may be,—are contracts of wager, in New Jersey, because they depend upon a chance or casualty, and are void.

2. BANKRUPTCY—DISCHARGE—GAMBLING IN STOCK IN ANOTHER STATE.

Where a bankrupt has failed by reason of wagering contracts in stock speculations in another state, he will not be entitled to his discharge in New Jersey, where he resides.

3. SAME—FAILURE TO KEEP PROPER BOOKS OF ACCOUNT.

Where a merchant drew large sums of money from his business, from time to time, to use in stock speculation, and put slips of paper, with the amounts so withdrawn, in the money drawer, as *memoranda* for his book-keeper, so that when he failed his cash-book showed a balance of thousands of dollars which did not exist, his discharge as a bankrupt will be refused, on the ground that he did not keep proper books of account.

On Specifications against Discharge.

*A. G. Richey & Son,* for opposing creditors.

*J. M. Williamson,* for bankrupt.

NIXON, J. Twelve specifications have been filed against the bankrupt's discharge. I have examined them with care, and have no difficulty in overruling all of them except two, to-wit, the third, charging him with gaming, and the ninth, alleging that he did not keep proper books of account.

1. The bankrupt was largely engaged in stock operations during the summer and fall of 1877. His losses, according to his own state-

ment, were from $150,000 to $200,000. He describes the manner of conducting these operations in Philadelphia and New York, as follows:

"In Philadelphia, where buying or selling 'puts' or 'calls,' or settling differences, is considered gaming, my transactions in stock were genuine purchases and sales. I would go to my broker, and would deposit a certain amount of money, which we would agree upon; he furnishing the balance. He would then go into the board of brokers, and buy the stocks I wanted; he holding the stocks as collateral for the amount of money advanced by him, to pay for the same. If the price of the stock went down, he would call on me to pay off part of my loan to protect him. In the *sale* of stock, that is, when I wanted to sell a stock short, I would go to him in like manner, give him a certain amount of money; he furnishing the difference required. He would then go and borrow the stock from some broker or institution, and take it, per my order, to the exchange and sell it. When I got ready to cover that short sale, I would give him the order to buy it, which, after he did it, he would take the stock and deliver it again to the party he had borrowed it of, receiving back the amount of money that the parties held for the return of the stock, and would deduct the amount he had loaned me, with interest and commissions; and the balance he would return to me, which would show my profit or loss, as the case might be, which in most cases would be a loss. In New York my stock operations were conducted upon the same general plan, with one exception, which was dealing in 'puts' and 'calls.' * * * On a few occasions there, after making my purchase or sale of stocks, which were conducted the same as in Philadelphia, I would have my broker call on Mr. Russell Sage to buy a 'put' or 'call,' as the case might require, to limit any loss I might make on the stock bought or sold."

The *method of purchasing, as thus described, is what is technically called a purchase on a margin.* All contracts for speculations in stocks upon margins, when the broker and the customer do not contemplate or intend that the stock purchased or sold shall become or be treated as the stock of the customer, but the real transaction is the mere dealing in differences between prices,—that is, in the payment of future profits or losses, as the event may be—are contracts of wager in New Jersey, because they depend upon a chance or casualty. It was so held in a recent case (*Flagg* v. *Baldwin*, 38 N. J. Eq. 219) by the court of errors and appeals, and the court refused to enforce such a contract, although made in New York, where they are enforceable; holding that there was no rule of comity which required them to violate the public policy of the state on the subject of betting and gambling.

I know that the bankrupt insists that he made a purchase of the stocks, and that their retention by the broker was simply collateral, to secure to him the repayment of the amount above the margin advanced by him in the purchase. But was that the essence of the transaction? Was it practically anything more than a mode of adjusting the differences between prices from time to time,—a device, in fact, to escape the peril of violating the laws against gaming? But if this is not so in regard to the buying and selling of stocks, can he—a resident of New Jersey, and chiefly carrying on his business in Pennsylvania—be allowed to go into another jurisdiction, and deal

in "puts" and "calls," and escape the charge and penalty of gaming because such dealings are valid and enforceable by the *lex loci contractus*, although reckoned gaming by the laws of the state of his residence, and of the state where his ordinary business was transacted? I do not, however, propose to rest the refusal of a discharge upon this specification.

2. In section 5110 of the Revised Statutes of the United States are set forth the grounds, upon the proof of any of which, a discharge must be refused. These provisions are 10 in number, and the seventh specification in the pending case is founded on the seventh subdivision of the section, to-wit, that the discharge cannot be granted "if the bankrupt, being a merchant or tradesman, has not at all times after March 2, 1867, kept proper books of account." This is the only one of the provisions which does not involve a fraudulent intent. The discharge must be withheld, irrespective of the intent, if the bankrupt has failed in this respect. During the last six months before his insolvency, his cash-book did not reveal his real pecuniary condition. He tells us that he was at this period in the habit of drawing thousands of dollars from his oil-cloth business to use in his stock speculations; that he would have no entry made upon any of his books of account of this withdrawal of capital, but would write upon a slip of paper, "Due from William R. Hunt," $———, stating the amount taken, and put it in his money drawer as a memorandum for his book-keeper to settle by. When he stopped business in December, 1877, these slips were gathered together, and aggregated $25,979.

I do not regard such a course of proceeding as keeping proper books of account. They do not speak the truth. His cash-book revealed a balance of many thousands of dollars which did not exist, and which he had in fact lost in stock speculations. I do not say that he intended to deceive or defraud his creditors. It is not necessary to say that. I will rather accept his statement that he expected to return the money to his business, and that he hoped to have a "lucky streak" in his speculations which would enable him to do so. But the lucky streak did not come. His notes went to protest for lack of funds, and when he succumbed his cash balance was nearly $26,000 less than his books of account showed.

The discharge must be refused.